# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WELDING ENGINEERS LTD.** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 16-4850** |
| **v.** | : | |
| | : | |
| **NFM/WELDING ENGINEERS, INC.** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                  NOVEMBER 26, 2018

## MEMORANDUM OPINION

### INTRODUCTION

On October 5, 2015, Welding Engineers Ltd. ("WEL"), as the Buyer, and NFM/Welding Engineers, Inc. ("NFM"), as the Seller, executed an agreement entitled Technology Transfer Agreement ("TTA"), in which NFM, *inter alia,* "irrevocably assign[ed] to Buyer the entire right, title and interest in the Purchased Technology,[1] free and clear of any Encumbrances." In exchange for the assignment and "in settlement of any remaining dispute involving the 1998 License Agreement and/or the Cross-License Agreement, the total Consideration due from Buyer to Seller . . . [wa]s USD 10,150,000, which amount [was to] be tendered by Buyer on the Closing Date." Section 2.4 of the TTA stipulated that "Seller agree[d] to provide copies of all drawings (i) for spare parts for the Purchased Technology and (ii) as the case may be, for machines covered by the Cross-License Agreement[.]"

On September 7, 2016, WEL filed this breach-of-contract action against NFM, essentially averring that NFM failed to comply with Section 2.4's requirement that NFM provide to WEL copies of all drawings for certain machines and spare parts. WEL seeks specific performance

---

[1]      Section 1.1.7 of the TTA defines "Purchased Technology" as "the entire right, title and interest of Seller in the Intellectual Property . . . used in or associated with non-intermeshing, counter-rotating twin screw extruders[.]"

of the agreement, compensatory damages, and "a declaratory judgment that NFM is in material breach of the TTA, and the limited license agreements contained in the TTA are therefore terminated." [ECF 1]. In the answer, NFM denies the averments in the complaint and asserts counterclaims against WEL premised on, *inter alia*, trademark infringement; and counterclaims under the Declaratory Judgment Act, 28 U.S.C. § 2201. [ECF 17 at 14-29].

Before this Court are the parties' cross-motions for summary judgment filed pursuant to Federal Rule of Civil Procedure ("Rule") 56. Specifically, WEL seeks summary judgment on its breach-of-contract claim against NFM and on all of NFM's counterclaims. [ECF 57]. In turn, NFM seeks summary judgment on both of WEL's claims and on Counts One, Two, and Three of its counterclaims.[2] [ECF 58]. The issues presented in the cross-motions for summary judgment have been fully briefed by the parties,[3] and are ripe for disposition. For the reasons set forth, each motion is granted, *in part*, and denied, *in part*.[4]

## BACKGROUND

As noted, WEL claims that NFM breached the TTA and, as a result of the breach, seeks specific performance requiring the delivery of all relevant drawings as well as compensatory damages for lost sales revenue caused by not having the drawings (Count I), and a declaration that NFM is in material breach of the TTA and, therefore, that the "limited license agreements"

---

[2]    At Count One, NFM seeks a declaratory judgment with respect to the "Welding Engineers" and the "W-E" design marks. At Count Two, NFM brings claims of misappropriation, false designation of origin, and unfair competition under the Lanham Act. At Count Three, NFM brings claims of common law trademark and trade name infringement and unfair competition.

[3]    In adjudicating the motions, this Court has also considered the parties' respective replies in support of their motions.

[4]    While this Memorandum Opinion adjudicates both cross-motions for summary judgment, separate Orders will be issued with respect to each party's motion.

referenced in the TTA are terminated (Count II). [ECF 1]. In its answer, NFM denies the allegations and, in turn, asserts counterclaims against WEL for misappropriation and infringement of NFM's trademarks, specifically, the infringement of the "Welding Engineers" name and the "W-E" logo in violation of Section 43(a) of the Lanham Act, 115 U.S.C. § 1125(a) (Count II) and common law (Counts III, VII), and seeks damages for these violations. NFM also seeks declaratory judgments declaring *to wit*: that WEL has no right to use any of the relevant trademarks (Count I); that certain disputed devices do not fall within the scope of the TTA's definition of "Turbulator Technology," and, thus, WEL is not entitled to royalties with respect to NFM's use of those devices (Count IV); that WEL is not entitled to drawings of a device called a "vertical feeder" (Count V); and that WEL is not permitted to offer barrels manufactured with hot isostatic pressing ("HIP") technology to customers and that NFM is entitled to sell HIP barrels to any customer in any "field of use" (Count VI). [ECF 17].

Procedurally, discovery ensued and closed. Thereafter, the parties filed cross-motions for summary judgment based on the following uncontested relevant facts:[5]

> WEL is a company which was incorporated in Switzerland in 1958 and has its principal place of business in Switzerland. As of 1998, WEL and its parent company, W Bar E Inc. ("W-Bar-E"), were engaged in the business of designing, manufacturing, marketing, and selling extrusion machinery utilized to remove water from synthetic rubber, and had developed substantial expertise, patents and trade secrets relating to equipment designed and manufactured for the purpose of dewatering and finishing of polymers based on single screw slurry feeders, single screw dewaterers, single screw dryers and turbulators, collectively known as "Single Screw Extruder Technology." An affiliate of WEL, Welding Engineers, Inc. ("WEI") designed, manufactured, and sold similar machinery using "twin screw extruder technology."[6]

---

[5]     These facts are derived from the parties' respective briefs and submissions. Where disputed, this Court has construed the facts in favor of the non-movant.

[6]     When WEL was founded, WEI was apparently its parent company. However, at an unspecified time thereafter, W-Bar-E became the parent company for WEL and WEI.

3

NFM is an Ohio corporation in the business of designing, manufacturing, and supplying extrusion equipment and other products for the plastic and rubber industries.

## The Asset Purchase Agreement

In April 1998, pursuant to an *Asset Purchase Agreement* (the "APA"), NFM acquired the rights to WEI's twin screw extruder technology.[7] (ECF 22-4 (APA) at Recitals A & B, and Section 1.01). The APA provided NFM with all of WEI's rights to use the "'W-E' logo" and corporate name "Welding Engineers, Inc." (*Id.* at Sections 1.01(d), 1.01(h)). The APA also required the consummation of "a duly executed agreement by and between [NFM] and [WEL], regarding [WEL]'s use of [WEL's] corporate name [*i.e.*, Welding Engineers Ltd.] and [NFM]'s use of the name 'Welding Engineers, Inc.'" (*Id.* at Section 5.02(f)).

## The License Agreement and Cross-License Agreement

Consistent with the requirement of the APA, WEL and NFM executed a *License Agreement* and a *Cross-License Agreement* on the same day they executed the APA, and agreed therein to the following:

- WEL would license the single screw extruder technology to NFM in exchange for royalties;
- NFM would license the twin screw extruder technology to WEL in exchange for royalties;
- WEL could sell products using either the single or twin screw technology outside of North America; and
- NFM could sell products using either technology in North America. (ECF 22-5 (License Agreement) at Sections 1.5, 3.1; ECF 22-6 (Cross-License Agreement) at Sections 1.5, 3.1).

In the Cross-License Agreement, WEL granted NFM the right to use "Licensed Technology" to make, use, market, and sell defined "Products," listed in Exhibit A to said agreement. (Cross-License Agreement at Sections 1.1, 1.3, 3.1, Exhibit A). Notably, vertical feeders were not among the products listed in Exhibit A.

Section 13 of the License Agreement, entitled "Use of Name and Logo," outlined the parties' agreements with respect to the use of their respective corporate names. Section 13 provided that pursuant to the APA, NFM had acquired from WEI "all of [WEI]'s right, title and interest in and to [WEI]'s corporate name [*i.e.*, Welding Engineers, Inc.] and the 'W-E' logo[.]" (*See* License Agreement at Section 13.1). The License Agreement further provided that NFM and WEL "desire[d] to set forth . . . their relative rights to the use of the Logo, the use of the name 'Welding Engineers', the use by [WEL] of its corporate name ["Welding

---

[7] Prior to entering into the APA, NFM's corporate name did not include "Welding Engineers, Inc."

Engineers Ltd."], and the use by NFM of the name 'Welding Engineers, Inc.'" (*Id.*) The parties further agreed that WEL "ha[d] the right to utilize its full corporate name, the name 'Welding Engineers', and the Logo for its existing business as conducted on the date hereof." (*Id.* at Section 13.2(a)). WEL agreed not to use the name "Welding Engineers" without WEL's "corporate designator (i.e., 'Ltd.')." (*Id.* at Section 13.2(b)). NFM, in turn "ha[d] the right to use the name 'Welding Engineers', the name 'Welding Engineers, Inc.' and the Logo, without the corporate designator ('Inc.') in connection with the business acquired from WEI [in the APA]." (*Id.* at Section 13.3(a)). NFM also agreed to seek trademark registrations for the names "Welding Engineers" and "Welding Engineers, Inc.," and for the Logo. (*Id.*). Finally, Section 13 concluded by providing that: "The provisions of this Section 13 shall survive termination of the license under this Agreement and termination of any other provision herein." (*Id.* at Section 13.5).

## The Technology Transfer Agreement

In April 2015, NFM[8] filed a lawsuit against WEL in the United States District Court for the Northern District of Ohio, averring that WEL had failed to report certain royalties owed under the License Agreement. *See NFM/Welding Engineers, Inc. v. Welding Engineers Ltd.*, 5:15-cv-000652 (N.D. Ohio), ECF 1. In October 2015, the parties settled that lawsuit by executing the *Technology Transfer Agreement* ("TTA"). (ECF 22-7 (TTA)). Pursuant to the TTA, WEL agreed to pay NFM $10,150,000 to settle the royalty dispute and to purchase NFM's rights to certain twin screw extruder technology (the "Purchased Technology"). NFM also agreed to provide WEL with all "drawings" for certain machines and spare parts. (*Id.* at Sections 1.1.7, 2.4, 3.1). Specifically, as to the drawings, the TTA section entitled "Perfection of Rights" provides:

> As soon as reasonably practicable after the Closing Date, Seller agrees to provide copies of all drawings (i) for spare parts for the Purchased Technology and (ii) as the case may be, for machines covered by the Cross-License Agreement, for the following companies: Lanxess, Inc., in Sarnia, Canada; Dyneon, LLC, in Decatur, Alabama; Solvay Specialty Polymers USA, LLC, in Thorofare, New Jersey; and Zeon Corporation in Hattiesburg, Mississippi. (*Id.* at Section 2.4).

In the section of the TTA entitled "Spare Parts License Back," WEL granted to NFM one license to use the Purchased Technology for work related to spare parts for a set of companies, and another license to use the "Turbulator Technology"[9] for work related to spare parts for a different set of companies. Both licenses were to expire five years after the execution of the TTA. (*Id.* at Section 4.1). Additionally,

---

[8]     By this point, NFM was known as NFM/Welding Engineers, Inc.

[9]     The TTA defines "Turbulator Technology" as "a proprietary device invented and developed by [WEL] which integrates a cylindrical cutter and cylindrical die (fixed or variable), a pelletizer and a transport system of the comminuted particles either by air or another fluid." (TTA at Section 1.1.8).

WEL granted NFM a third license to use the Turbulator Technology for work related to spare parts for Exxon Mobil Corporation and/or its affiliates. (*Id.* at Section 4.4).

The section of the TTA entitled "Termination of 1998 License Agreement and Cross-License Agreement and Release" provides that:

> As of the Closing Date, the Parties agree that the 1998 License Agreement and the Cross-License Agreement terminate, and that execution of this new independent Agreement shall be evidence of mutual written agreement as to the termination of the 1998 License Agreement and the Cross-License Agreement. The Parties, on their own behalf and on behalf of their respective Affiliates, hereby fully, irrevocably and forever, release, acquit and discharge each other and their respective Affiliates, officers, directors, managers, members, employees, agents and partners from any and all demands, damages, causes of action, liability or claims (of any kind, manner, nature and description, known or unknown) related to or arising out of the 1998 License Agreement and/or the Cross-License Agreement. Each Party hereto voluntarily and with full knowledge of its significance, expressly waives, releases and relinquishes any and all rights with respect to the 1998 License Agreement and/or the Cross-License Agreement it may have under any state or federal statute, rule or common law principle, in law or equity, relating to limitations on general releases, specifically under California Civil Code Section 1542 (or any other law or regulation of similar effect, in any jurisdiction), which provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OP EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR." (*Id.* at Section 7.12).

Additionally, in the section of the TTA titled "Limitation on Remedies," the parties agreed that:

> [WEL]'s remedy for the breach by [NFM] of any of the provisions of this Agreement, and [NFM]'s remedy for the breach by [WEL] of any of the provisions of this Agreement, shall be limited to a claim for actual damages and/or a possible injunctive relief or temporary restraining order, but neither party shall be entitled to any other equitable relief, including, but not limited to rescission, revocation or other similar remedy. (*Id.* at Section 7.1).

In February 2016 (four months after the execution of the TTA), WEL requested from NFM, *inter alia*, the delivery of all the drawings of machinery

referenced in the TTA, including, the drawings of the vertical feeder, the parts list, drawings list, components data sheets, and serial numbers list. (ECF 59-9 at 17-19). In response, NFM asserted that WEL had "grossly exaggerated and misinterpreted" the relevant provisions of the TTA. (*Id.* at 22). An impasse resulted and in September 2016, WEL filed the instant breach-of-contract complaint averring, *inter alia*, that NFM had not provided it with drawings "in detail that include[] the parts lists, drawings lists, component data sheets and serial numbers of the machines" (collectively, "the Data"), and requesting, *inter alia*, specific performance by way of delivery of said drawings. (ECF 1 at ¶¶ 17, 26). In October 2016, NFM produced a batch of drawings to WEL that did not include drawings related to the vertical feeder. (Pl.'s Br. [ECF 57-1] at 15). NFM asserts that the drawings produced were given to WEL "as they were." (ECF 64 at 12; ECF 64-11 at 14). Many of the drawings contained the Data embedded directly on the drawings themselves. (ECF 56-22, (WEL's expert's report) at 6).[10] According to NFM's corporate representative, if the drawings contained the Data, the drawings were produced without redaction. (ECF 64 at 12; ECF 64-11 at 14). Other drawings produced by NFM did not contain the Data itself, but had notations referencing external documents containing the Data. (ECF 56-22, 56-23). NFM's corporate representative testified that the drawings NFM produced that contained the relevant information directly on the drawing were a "freebie bonus."[11] (ECF 64-11 at 10-14).

## LEGAL STANDARD

Rule 56 governs the practice for summary judgment motions. Fed. R. Civ. P. 56. Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[10] In his report, WEL's expert provided that he "found that over 70% of the drawings provided by [NFM] . . . included parts lists, bills of materials or notes regarding the parts or assemblies shown in the drawings." (WEL's expert's report at 6). Although this statement is presented as a fact, was not rebutted by NFM and, thus, appears to be undisputed, this Court has understood this fact to merely mean that "many" of the drawings contained the Data.

[11] NFM appears to take the position that any Data not embedded directly on the drawings neither constitutes, nor is part, of a "drawing," because the term was not defined in the TTA to include Data not included on the drawing itself.

7

242, 248–49 (1986). Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251–52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145–46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims and/or defenses, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotex*, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant summary judgment where the non-movant's evidence is merely colorable, conclusory, or speculative. *Anderson*, 477 U.S. at 249–50. In order to defeat a motion for summary judgment, there must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. *Id.* at 252; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Further, a party may

not defeat a motion for summary judgment with evidence that would not be admissible at trial. *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 (3d Cir. 1999).

The standards to be applied in deciding cross-motions for summary judgment are the same as those applied when only one party has filed a summary judgment motion; the court rules "on each party's motion on an individual and separate basis, determining, for each side, whether summary judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 403 (3d Cir. 2016) (citation and internal quotation marks omitted).

## DISCUSSION

As noted, WEL seeks summary judgment on its breach-of-contract claim against NFM, and on all of NFM's counterclaims against it. NFM seeks summary judgment on its counterclaims for and related to trademark infringement, (Counterclaims I, II, and III), and on WEL's claims. These motions and arguments will be separately addressed.

### *WEL'S MOTION FOR SUMMARY JUDGMENT*
*WEL's Count I – Breach of Contract*

In the complaint, WEL contends that NFM breached Section 2.4 of the TTA by failing to provide WEL with all drawings, "in detail that include[] the parts lists, drawings lists, component data sheets and serial numbers of the machines" (collectively, "the Data"), and, as a result of this failure, requests, *inter alia*, specific performance by way of delivery of said drawings. (ECF 1 at ¶¶ 17, 26). After the complaint was filed, NFM produced a series of drawings to WEL, many containing the Data embedded directly on the drawings themselves. However, some of the drawings produced by NFM did not contain the Data itself, but had notations referencing external documents containing the Data. WEL contends that there is no genuine issue of material fact as to the meaning of the term "drawings" in Section 2.4 of the TTA and that the term unambiguously

9

includes the external documents containing the Data, which were incorporated by reference into some of the produced drawings. Thus, WEL argues entitlement to judgment as a matter of law on its claim for the specific performance of the delivery of the external documents not produced. Conversely, NFM argues that the use of the term "drawings" in Section 2.4 unambiguously referred to *only* the drawings and excluded any and all external documents referenced in the drawings. This Court agrees with WEL.

Pennsylvania law governs the interpretation of the TTA.[12] Under Pennsylvania law, "'the task of interpreting a contract is generally performed by a court rather than by a jury.'" *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 363 (3d Cir. 2004) (quoting *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)). In doing so, a court endeavors "to ascertain the intent of the parties as manifested by the language of the written instrument." *Id.* The interpretation of a contractual term only becomes a question for the jury if the term is deemed to be ambiguous. *Community College v. Society of the Faculty*, 375 A.2d 1267, 1275 (Pa. 1977). A contractual term is ambiguous where, "viewed in the context of the entire [contract], [it] is 'reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *J.C. Penney*, 393 F.3d at 363 (quoting *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999) (citing, *inter alia, Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986))). Courts employ common sense in construing contracts. *See Bollinger v. Palmerton Area Communities Endeavor, Inc.*, 361 A.2d 676, 684 (Pa. Super. Ct. 1976) ("There is no cannon against using common sense in construing a contract, so that a strained construction does not defeat its intent and purpose.") (citation and internal quotation marks omitted).

---

12      *See* TTA at Section 7.4.

10

Here, the parties both argue that the term "drawings," as used in Section 2.4 of the TTA, is unambiguous. They disagree, however, on the meaning of the unambiguous term. Under Pennsylvania law, "mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous." *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 94 (3d Cir. 2001). After carefully reviewing the TTA, this Court finds that there is no ambiguity in the meaning of "drawings" as used in Section 2.4. In the context of the TTA, "drawings" clearly refers to drawings that can meaningfully assist WEL in manufacturing the relevant parts and machinery.

The Court is unpersuaded by NFM's contention that professionally created drawings of complicated machinery, bereft of technical data incorporated by reference on the drawing itself, could satisfy the intent of the parties as evidenced by the TTA contract. Indeed, it is undisputed that many of the drawings NFM produced to WEL in October 2016 contained the Data embedded directly on the drawings, while other drawings provided by NFM to WEL referenced separate external documents that contained the Data. The essence of NFM's argument is that, under the negotiated terms of the TTA, "a drawing is just a drawing" and nothing more, and so long as NFM provided WEL with drawings of the relevant machinery and parts, NFM satisfied Section 2.4. However, consideration of the entire TTA simply does not support this contention. WEL paid over $10 million dollars for, *inter alia*, the right to manufacture certain equipment and to purchase the rights, title and interest in the intellectual property related to the twin screw extruder technology. As part of the TTA, NFM was required to give WEL drawings necessary for WEL to accomplish that purpose. Further, for the drawings to meaningfully assist in manufacturing the equipment, these drawing must include or be accompanied by the Data referenced in the drawings. This is true whether the Data is directly embedded on the drawings themselves, or incorporated by

11

reference in the drawings but actually contained in external documents. NFM's implication that WEL should just "figure it out" without the benefit of the missing Data was not part of the bargain. Thus, this Court finds that NFM has not satisfied Section 2.4 in so far as some of the drawings produced did not provide the Data incorporated by reference on the drawings themselves. Accordingly, WEL's motion for summary judgment is granted with respect to its breach-of-contract claim and its request for specific performance of the delivery of the relevant external documents containing Data referenced in the drawings that NFM produced in October 2016.[13]

## *Count V of the Counterclaims - The Vertical Feeder*

WEL next seeks summary judgment on Count V of NFM's counterclaims, in which NFM seeks a declaratory judgment that WEL is not entitled to drawings of the "vertical feeder." NFM did not move for summary judgment on this counterclaim. Nonetheless, pursuant to Rule 56(f)(1), a court may, after giving notice and a reasonable time to respond, "grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f)(1). Although notice of a court's intent to grant summary

---

[13]     As noted, NFM primarily contends that the term "drawings" as used in Section 2.4 is unambiguous. However, NFM argues that, in the event this Court finds ambiguity in the term, prior drafts of the TTA demonstrate that WEL unsuccessfully attempted to negotiate a requirement that NFM provide the relevant external documents along with the drawings. As noted, this Court finds no ambiguity in the term. However, the Court notes that NFM may have intended to argue that the prior drafts of the TTA create a latent ambiguity in the meaning of the term. *See Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) ("When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.") (citations omitted); *see also Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93-94 (3d Cir. 2001) (noting that "Pennsylvania law on ambiguity in contracts thus seems to contain a built-in tension . . . when a court is faced with a contract containing facially unambiguous language, it seems that Pennsylvania law both requires that the court interpret the language without using extrinsic evidence, and allows the court to bring in extrinsic evidence to prove latent ambiguity."). To the extent NFM intended to argue that there is a latent ambiguity, this Court disagrees. None of the prior drafts demonstrated that WEL sought specific language in the contract requiring delivery of the relevant documents. Indeed, the prior drafts cited by NFM did not explicitly require NFM to provide WEL with anything tangible, drawings or otherwise. Accordingly, this Court concludes that there is no latent ambiguity in the term "drawings" as used in the TTA.

12

judgment pursuant to Rule 56(f)(1) is typically required, the United States Court of Appeals for the Third Circuit recognized in *Gibson v. Mayor & Council of City of Wilmington* that an exception to this rule applies when there is a fully developed record, a lack of prejudice to the parties, and a decision on a purely legal issue. 355 F.3d 215, 223-24 (3d Cir. 2004) (affirming district court's grant of summary judgment in favor of a non-moving party and against a party that brought a motion for summary judgment, without first giving notice to moving party); *see also Zimmerlink v. Zapotsky*, 539 F. App'x 45, 49 (3d Cir. 2013) (holding same and quoting *Gibson*). The court in *Gibson* agreed with the United States Court of Appeals for the First Circuit that, "[i]n the context of *sua sponte* summary judgment [for the nonmoving party]," notice is accomplished where "'the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" *Gibson*, 355 F.3d at 223-24 (quoting *Leyva v. On the Beach, Inc.*, 171 F.3d 717, 720 (1st Cir. 1999)). WEL, by moving for summary judgment on Count V of NFM's counterclaims, had notice, and in fact requested, that this Court address the issue of the vertical feeder. WEL, as the movant, has had ample opportunity to present all evidence and arguments supporting its position on the matter, and "to put its best foot forward" in doing so. Thus, under *Gibson*, WEL had sufficient notice for this Court to exercise its authority under Rule 56(f)(1) and grant summary judgment in NFM's favor.

As noted, Section 2.4 of the TTA requires NFM to provide WEL with the drawings "for machines covered by the Cross-License Agreement[.]" At issue is whether the vertical feeder is a machine covered by the Cross-License Agreement. This Court concludes that the vertical feeder was not covered.

At the outset, the Cross-License Agreement indicated that WEL and W-Bar-E were "engaged in the business of designing, manufacturing and selling extrusion machinery for the

13

synthetic rubber processing industry." (Cross-License Agreement at page 1). The primary purpose of the Cross-License Agreement was for WEL to license certain single screw extruder technology to NFM (the "Licensed Technology"), so that NFM could "make, use, market and sell the Products" in North America. (*Id.* at Section 3.1). To this end, WEL "agree[d] to provide to [NFM] sufficient information and materials relating to the Licensed Technology, to allow [NFM] to make, use, sell and market the Products." (*Id.* at Section 3.3). The Cross-License Agreement in turn defined "Products" as "any of the items listed on Exhibit A hereto, which are designed, manufactured and sold either individually or in combination, utilizing the Licensed Technology for the processing of polymers." (*Id.* at Section 1.3). The vertical feeder was *not* listed in Exhibit A to the Cross-License Agreement. In light of these facts, this Court concludes that there is no genuine issue of fact that the TTA's reference to "machines covered by the Cross-License Agreement," was a reference to the "Products" specifically defined in the Cross-License Agreement. This product definition did not include the vertical feeder.[14] Therefore, this Court finds that NFM is not required to produce drawings of the vertical feeder under Section 2.4 of the TTA. Accordingly, NFM, as the nonmovant, is entitled to summary judgment as to Count V of its counterclaims.

### *Counts I, II, III, and VII of the Counterclaims - Trademark Infringement*

WEL also seeks summary judgment with respect to NFM's counterclaims for and related to trademark infringement. In these counterclaims, NFM alleges that WEL infringed upon the "Welding Engineers" name and the "W-E" logo in violation of Section 43(a) of the Lanham Act,

---

[14]     The Court notes WEL's argument that the vertical feeder fit into the Cross-License Agreement's definition of "Licensed Technology," and thus was a "machine[] covered by the Cross-License Agreement." However, even assuming, *arguendo*, that this is correct, the Cross-License Agreement clearly stated that the Licensed Technology was only a means to the end of NFM obtaining the ability to make and sell Products, and the vertical feeder was not included in the defined list of those Products.

14

115 U.S.C. § 1125(a) (Count II) and common law (Counts III, VII). NFM also seeks a declaration that WEL has no right to use either trademark (Count I). For the reasons set forth, this Court concludes that WEL is entitled to summary judgment as to these claims.

At issue is whether WEL, by the TTA's provision entitled "Termination of 1998 License Agreement and Cross-License Agreement and Release," relinquished *all* rights in its corporate name, "Welding Engineers, Ltd.," which it has used since it was incorporated in 1958. Under Pennsylvania contract law, the rules of contract construction govern the interpretation of releases. *Bickings v. Bethlehem Lukens Plate*, 82 F. Supp. 2d 402, 406 (E.D. Pa. 2000) (citing *Evans v. Marks*, 218 A.2d 802 (1966), and *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885 (3d Cir. 1975)). As such, courts endeavor to ascertain the intent of the parties based on "(1) the language of the release and (2) the circumstances surrounding the execution of the release." *Bickings*, 82 F. Supp. 2d at 406 (citing *Wenger v. Ziegler*, 226 A.2d 653 (1967)). Pennsylvania courts have long held that "a release covers only those matters which may fairly be said to have been within the contemplation of the parties when the release was given." *Restifo v. McDonald*, 230 A.2d 199, 201 (Pa. 1967). The language of the release is viewed in the context of the entire contract. *ILM Sys. v. Suffolk Constr. Co.*, 252 F. Supp. 2d 151, 158 (E.D. Pa. 2002). Additionally, courts must examine the circumstances surrounding the execution of a release to determine the parties' intent, as such circumstances "clarify the intention of the parties and identify 'matters which may be fairly said to have been within the contemplation of the parties when the release was given.'" *Bickings*, 82 F. Supp. 2d at 406 (quoting *Vaughn v. Didizian*, 648 A.2d 38 (1994)).

With these principles in mind, this Court has reviewed the relevant releases in light of the agreements made. NFM argues that Section 13 of the Cross-License Agreement, which outlined the parties' agreements regarding the use of their respective corporate names, is the sole source of

15

WEL's legal right to use its corporate name and logo. NFM further contends that any rights obtained under the Cross-License Agreement, including the use of the corporate name, were extinguished by the following language of the TTA release:

Each Party hereto voluntarily and with full knowledge of its significance, expressly waives, releases and relinquishes any and all rights with respect to the 1998 License Agreement and/or the Cross-License Agreement it may have under any state or federal statute, rule or common law principle, in law or equity, relating to limitations on general releases, specifically under California Civil Code Section 1542 (or any other law or regulation of similar effect, in any jurisdiction), which provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

(TTA at Section 7.12). NFM's reliance on this provision is misplaced.

When the language in this provision is parsed, it simply means that the parties release any rights they may have "relating to limitations on general releases." The TTA, by way of illustration, cites to California Civil Code Section 1542, which limits general releases from extending to claims unknown at the time of the agreement. As WEL aptly argues in rebuttal, "[t]he purpose of this language is clear and unambiguous: it enables the parties to release both known and unknown claims arising under the License Agreement and Cross-License Agreement, as unknown claims cannot be released in some jurisdictions unless that right is waived explicitly." (ECF 57-1 (Pl.'s Br.) at 41). This Court agrees.

This Court finds that the plain language of Section 7.12 of the TTA clearly provides that the parties are releasing their rights relating to limitations on general releases. Section 7.12 cannot be read to state, as NFM suggests, that the parties are releasing *any and all* rights they have under the License and Cross-License Agreements, including WEL's rights to the use of its corporate name and logo.

16

This Court further notes the context and circumstances of the execution of the TTA, as it relates to this issue. *See Bickings*, 82 F. Supp. 2d at 406. The TTA does not once mention or discuss any parties' rights to the corporate name and/or logo. Conversely, the Cross-License Agreement contained explicit language establishing the survival of the parties' rights in their respective use of the relevant trademarks. Specifically, Section 13.5 provided: "The provisions of this Section 13 shall survive termination of the license under this Agreement and termination of any other provision herein." (*Id.* at Section 13.5). Thus, given the plain and unambiguous language of Section 13.5, merely terminating the Cross-License Agreement was insufficient to extinguish any rights WEL had to the use of its corporate name and logo under the Agreement.[15] This context renders implausible NFM's contention that by executing the TTA, WEL intended to relinquish all of its rights to its corporate name, which it has used since 1958.

For these reasons, summary judgment is granted in WEL's favor as to Counts I (declaratory judgment as to trademark infringement), II (violations of the Lanham Act), III (common law trademark infringement and unfair competition), and VII (unjust enrichment), of NFM's counterclaims.

### *Count VI of the Counterclaims - Turbulator Technology*

At Count IV of the counterclaims, NFM seeks a declaration that certain "disputed devices do not fall within the scope of the TTA's definition of Turbulator Technology and that NFM/Welding Engineers is not subject to any limitation or restriction in use of the devices, and WEL is not entitled to any royalty in relation [sic] NFM/Welding Engineers' use of such

---

[15]     NFM argues that the TTA extinguished all of WEL's rights under the License Agreement to WEL's corporate name and logo because the TTA contained language stating it "supersedes all prior agreements" and that the License and Cross-License Agreements were terminated by its execution. This conclusion is clearly incorrect, given the language of Section 13.5 of the Cross-License Agreement.

devices."[16] Only WEL has moved for summary judgment as to this counterclaim. WEL argues that this counterclaim should be dismissed as not ripe under the Declaratory Judgment Act or, in the alternative, that it is entitled to summary judgment. As explained below, this Court disagrees with WEL as to both arguments, and concludes that this issue is ripe and that WEL is not entitled to summary judgment.

The Declaratory Judgment Act creates a remedy by which federal courts "may declare the rights and other legal relations of any interested party seeking such declaration" when there is a "case of actual controversy." 28 U.S.C. § 2201. Thus, the dispute between the parties must be ripe for judicial intervention; it cannot be "nebulous or contingent," but "must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.,* 344 U.S. 237, 244 (1952). Declaratory judgment is only available for "concrete cases admitting of an immediate and definite determination of the legal rights of the parties." *Id.* at 243.

To determine whether a dispute has matured to a point that permits judicial intervention, courts consider the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Wyatt v. Virgin Islands, Inc.*, 385 F.3d 801, 806 (3d Cir. 2004). A dispute is not ripe if it rests on contingent future events that may not occur as anticipated, or even at all. *Id.* A court evaluates ripeness by examining (1) the adversity of the parties' interests,

---

[16]     The TTA defines Turbulator Technology as "a proprietary device invented and developed by [WEL] which integrates a cylindrical cutter and cylindrical die (fixed or variable), a pelletizer and a transport system of the comminuted particles either by air or another fluid." (TTA at Section 1.1.8). In the TTA, WEL granted NFM licenses to use the Turbulator Technology for work related to spare parts for Exxon Mobil Corporation and/or its affiliates, as well as another set of companies, in exchange for royalties. (*Id.* at Section 4.4).

(2) the conclusiveness of the judicial judgment, and (3) the utility, or practical help, of a judgment. *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990).

Here, all of the ripeness factors are present. Clearly, the parties have adverse legal interests regarding the Turbulator Technology. NFM has alleged an actual dispute between the parties as to whether certain devices fall within the TTA's definition of Turbulator Technology, and whether NFM is required to pay royalties for the sale of those devices. This dispute is prevalent in that NFM is currently paying royalties under protest. The Court also finds that the issue lends itself to a conclusive judgment as there are concrete factual issues to be resolved, *i.e.*, whether or not the disputed devices fall within the scope of Turbulator Technology. Finally, such a declaratory judgment would have utility to the parties in resolving any royalty dispute. Accordingly, this issue is ripe for adjudication under the Declaratory Judgment Act.

With regard to WEL's merits argument, the Court concludes that genuine issues of material fact exist as to whether the disputed devices fall into the TTA's definition of Turbulator Technology, namely, a device invented and developed by WEL that meets the other relevant criteria. *See Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 n.12 (3d Cir. 2002) ("The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief.") (citations omitted). As such, WEL's motion for summary judgment as to Count IV of NFM's counterclaims is denied.

### *Count VI of the Counterclaims - HIP Barrels*

At Count VI of the counterclaims, NFM seeks two declarations; *to wit*: (1) that WEL is not permitted to offer HIP barrels to customers, "as it is a proprietary technology used on NFM/Welding Engineers' counter-rotating twin screw extruders both inside and outside the field of use as described in the TTA"; and (2) that NFM is entitled to sell HIP barrels to any customer

19

in any "field of use." Only WEL has moved for summary judgment on this counterclaim. As to the first requested declaration, WEL apparently concedes that the issue is ripe, arguing only that it is entitled to summary judgment on the merits. WEL argues that the second requested declaration should be dismissed as not ripe under the Declaratory Judgment Act or, in the alternative, that it is entitled to summary judgment.

The TTA expressly excluded barrels manufactured with HIP technology from the scope of the "Purchased Technology" that WEL acquired from NFM. (TTA at 1.1.7). The issues raised by NFM's counterclaims, however, revolve around the import of this exclusion as it relates to the parties' respective rights to HIP barrel technology.

As to the first requested declaration—that WEL is not permitted to offer HIP barrels to its customers—WEL "does not dispute that NFM's drawings of HIP barrels were excluded from the scope of transfer effected by the TTA, but certainly disputes that NFM has cornered the market on HIP barrel technology." (ECF 57-1 at 56). As such, WEL argues that it is permitted under the TTA to sell HIP barrels. These disputes have not been factually flushed out in the parties' motions. As with the Turbulator Technology dispute, this Court concludes that genuine issues of material fact exist as to what, if any, HIP barrel technology NFM may preclude WEL from selling. Accordingly, WEL's motion for summary judgment is denied on the first requested declaration in counterclaim VI.

As to the second requested declaration—that NFM is entitled to sell HIP barrels to any customer in any "field of use"—WEL argues that the request should be dismissed as not ripe under the Declaratory Judgment Act, contending that "[f]actual determinations such as the type of HIP barrel sold, to whom, and for what use are just examples of facts that would be needed in order for the court to adjudicate any such dispute." (ECF 57-1 at 57). This Court disagrees, and concludes

that the matter is in fact ripe, given that the parties have adverse legal interests, the Court can issue

a conclusive judgment, and such a judgment would have utility to the parties. *See Step-Saver Data*

*Sys.*, 912 F.2d at 647. As to WEL's request for summary judgment, this Court deems that the same

issues WEL cited in arguing that the dispute is not ripe—*i.e.*, factual determinations regarding the

type of HIP barrel sold, to whom, and for what purpose—are genuine issues of material fact which

preclude summary judgment. Accordingly, WEL's motion is denied with regard to the second

requested declaration in Count VI of NFM's counterclaims.

## *NFM'S MOTION FOR SUMMARY JUDGMENT*
### *WEL's Counts I and II*

As noted, at Count I, WEL claims that NFM breached the TTA by failing to provide WEL

with the drawings. At Count II, WEL requests a declaratory judgment that such breach is material

and, therefore, the "limited license agreements" referenced in the TTA should be terminated.

In its motion for summary judgment as to these two counts, NFM simply contends that it

did not breach the TTA. As discussed above, this Court has concluded that NFM did breach the

TTA when it failed to provide the drawings. On that basis, this Court granted WEL's motion for

summary judgment as to WEL's request for specific performance on the breach-of-contract claim

at Count I. Since the issue of a breach of contract has been decided, NFM's motion for summary

judgment as to Count I (with regard to specific performance only), and Count II, is denied.[17]

### *Damages for Breach of Contract*

NFM moves for summary judgment on WEL's request for compensatory damages for the

breach-of-contract claim, arguing that WEL has not provided any evidence of damages. In

---

[17]     With regard to Count II, this Court notes that the parties did not brief whether NFM's breach was
material, or whether termination of the limited license agreements is an available remedy under the TTA.
(*See* TTA at Section 7.1 (providing that, in the event of a breach, the available remedies "shall be
limited to a claim for actual damages and/or a possible injunctive relief or temporary restraining order,
but neither party shall be entitled to any other equitable relief, including, but not limited to rescission,
revocation or other similar remedy.")). Accordingly, this Court will not address these issues.

21

response, WEL asserts that it "[h]as [p]roperly [p]led [d]amages," (ECF 61 at 9); that damages are easily identifiable; and that, at the very least, it is entitled to nominal damages.

A party cannot overcome a motion for summary judgment with respect to damages by merely relying on pleadings. *See Berckeley Inv. Grp. Ltd.*, 455 F.3d at 201 (holding that once moving party has shown absence of evidence to support non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."). Furthermore, the mere assertion that a party "can . . . easily identify damages related to the breach," (ECF 61 at 10), without more, is insufficient to overcome a summary judgment motion. Under Pennsylvania law, proving damages resulting from a breach of contract requires a plaintiff to provide a factfinder with "evidence from which damages may be calculated to a 'reasonable certainty.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225-26 (3d Cir. 2003) (quoting *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 668 (3d Cir. 1998)). For a damages calculation to be capable of reasonable certainty, it must not be "'too speculative, vague or contingent' upon some unknown factor." *ATACS Corp.*, 155 F.3d at 669 (quoting *Spang & Co. v. United States Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988)). Although Pennsylvania contract law does not require mathematical certainty in calculating damages, "the plaintiff must introduce sufficient facts upon which the jury can determine the amount of damages without conjecture." *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. 1983).

Here, WEL argues that NFM's failure to provide the complete versions of the drawings "prevented [WEL] from manufacturing, servicing, and selling machines and spare parts, resulting in lost sales." (ECF 61 at 10). However, the only evidence WEL points to in support of this argument is a few of NFM's past royalty reports with no explanation provided. This is not a

sufficient showing from which a damages calculation can be made to a reasonable degree of certainty. *See Ware*, 322 F.3d at 225-26. Thus, WEL has failed to present evidence sufficient to for a factfinder to conclude that WEL is entitled to compensatory damages.

WEL correctly asserts, however, that under Pennsylvania law any breach of contract entitles the injured party to at least nominal damages. *See Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497 (3d Cir. 2015) (citing *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984), and *Scobell Inc. v. Schade*, 688 A.2d 715, 719 (Pa. Super. Ct. 1997)). To defeat summary judgment based on an entitlement to nominal damages, a plaintiff must request nominal damages in its complaint or seek to amend its complaint to request nominal damages. *Cohen v. Resolution Trust*, 107 F. App'x 287, 289-90 (3d Cir. 2004) (applying Pennsylvania contract law to affirm dismissal of a breach-of-contract claim for failure to state a claim for compensatory or punitive damages, and noting that "plaintiffs requested only compensatory and punitive damages in their amended complaint, and nothing in the record suggests that they asked to amend their complaint to include nominal damages."); *Norfolk Southern Ry. Co. v. Pittsburgh & West Virginia R.R. and Power Reit*, 2014 WL 2808907 (W.D. Pa. June 19, 2014) (applying Pennsylvania contract law to deny summary judgment on breach-of-contract claim where plaintiffs failed to plead damages with reasonable certainty, or to request nominal damages in their complaint, because plaintiffs sought leave to amend to request nominal damages).

In the complaint, WEL requests compensatory damages only, and does not request nominal damages. Further, WEL has not sought to amend its complaint to include a request for nominal damages. Accordingly, NFM is entitled to summary judgment on WEL's request for damages arising from the breach of contract claim.

*Counts I, II, and III of the Counterclaims - Trademark Infringement*

As to NFM's counterclaims for trademark infringement, *i.e.*, Counts I (declaratory judgment as to trademark infringement), II (violations of the Lanham Act), and III (common law trademark infringement and unfair competition), these issues were discussed above with respect to WEL's summary judgement motion and, therefore, need not be readdressed. Accordingly, for the reasons previously stated in said discussion, NFM's motion for summary judgment is denied.

## CONCLUSION

To summarize, consistent with the analysis made, WEL's motion for summary judgment is granted as to Count I of its complaint for the specific performance of the delivery of the relevant external documents referenced in the drawings NFM produced in October 2016 (excluding drawings of the vertical feeder), and as to Counts I, II, III, and VII of the counterclaims. WEL's motion for summary judgment is denied as to its request for damages at Count I of its complaint, and as to Counts IV, V, and VI of the counterclaims.

NFM's motion for summary judgment is granted as to WEL's request for damages at Count I of its complaint. NFM is also granted summary judgment as to its request at Count V of the counterclaims for declaratory judgment that WEL is not entitled to drawings of the vertical feeder. NFM's motion for summary judgment is denied as to WEL's request at Count I of its complaint for specific performance of the relevant external documents; as to Count II of WEL's complaint; and as to Counts I, II, and III of the counterclaims.

Separate Orders addressing each motion for summary judgment and consistent with this Memorandum Opinion follow.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.