# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WELDING ENGINEERS LTD.** | : | **CIVIL ACTION** |
| *Plaintiff/Counterclaim Defendant* | : | |
| | : | **NO. 16-4850** |
| **v.** | : | |
| | : | |
| **NFM/WELDING ENGINEERS, INC.** | : | |
| *Defendant/Counterclaim Plaintiff* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                    JANUARY 26, 2021

## MEMORANDUM OPINION[1]

**INTRODUCTION**

This matter has a protracted history that is known to the parties and will only be referenced herein when necessary.  For the purpose of clarity, Plaintiff/Counterclaim Defendant Welding Engineers Ltd. will be referred to as "Welding"; Defendant/Counterclaim Plaintiff NFM/Welding Engineers, Inc. will be referred to as "NFM".

After ruling on the parties' cross motions for summary judgment, [*see* ECF 83, 84], NFM's counterclaims at Counts Four and Six survived and proceeded to be tried without a jury before this Court.  These counterclaims stem from a contractual dispute between the parties regarding a written agreement entitled Technology Transfer Agreement ("TTA").  At trial, NFM sought judgments pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, regarding the parties' respective rights and responsibilities under the TTA as to the remaining counterclaims.  Specifically, Count Four seeks a determination as to whether royalties are owed for the use of turbulator technology, and Count Six seeks a determination involving barrels manufactured using

---

[1]      This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

Hot Isostatic Pressing ("HIP") technology.  Following the conclusion of the bench trial, the parties filed proposed findings of fact and conclusions of law.  [ECF 149, 150].  In reaching its findings of facts and conclusions of law, this Court considered the parties' filings, the trial testimony, and assessed the credibility of the witnesses.  The opinion addresses each counterclaim, *seriatim*.

## COUNT FOUR- ROYALTIES FOR TURBULATOR TECHNOLOGY

### *Introduction*

At Count Four, NFM seeks a declaratory judgment that: (1) certain disputed devices do not fall within the scope of the TTA's definition of Turbulator Technology because they fail to satisfy every component of the definition, (2) NFM is not subject to any limitation or restriction in its use of those disputed devices, and (3) Welding is not entitled to any royalties from NFM based on NFM's use of those disputed devices.  [ECF 17].  Specifically, NFM argues that the disputed devices were not invented by, developed by, or proprietary to Welding.  Welding disagrees and argues that those devices satisfy every component of the definition.  For the reasons set forth below, this Court finds that the disputed devices fall within the scope of the TTA's definition of Turbulator Technology and, therefore, NFM owes royalties to Welding.

*Count Four: Findings of Fact with Respect to Royalties for Turbulator Technology*[2]

Based on the evidence presented at the bench trial and the submissions filed, this Court finds as follows: Welding is a Swiss corporation that began its corporate existence as a subsidiary of Welding Engineers, Inc. ("WEI"), a Delaware corporation.  Welding is an engineering company that specializes in the design, manufacture, and sale of machinery, equipment, and related parts used in the synthetic rubber industry.  In 1966, Welding and WEI entered into a licensing

---

[2]   At trial, Henrique Gemperle testified as a witness for Welding, and Paul Roberson (NFM's CEO) and John Roberson testified as witnesses for NFM.  Additionally, excerpts from the deposition testimony of Phil Roberson were admitted into evidence.

agreement under which the companies agreed to share their respective "inventions, improvements and innovations" regarding several devices, including the "single screw extruders," regardless of which of the two companies "developed or acquired" any such inventions, improvements, and/or innovations.[3]

In the early 1970s, WEI invented a device called a turbulator, which was the subject of U.S. Patent No. 3,874,835 ("Patent 835"). The turbulator was designed to attach to the end of an extruder in order to dry and sever the extruded material into pellets; the turbulator did this in a manner not previously known or practiced in the synthetic rubber industry. In Patent 835's documentation and the sales literature for the turbulator, the turbulator was described as a device that integrates a cylindrical cutter, a cylindrical die (fixed or variable), a pelletizer, and a transport system of the comminuted particles either by air or another fluid.[4] The turbulator still remains a unique product today.[5]

Welding and WEI renewed their 1966 license agreement in 1985 and 1992. In 1997, WEI reorganized and changed its name to W Bar E, Inc. (for purposes of clarity and consistency, W Bar E, Inc. will continue to be referred to as WEI). On April 16, 1998, Welding and WEI renewed their license agreement, executing it for the fourth time. This 1998 license agreement explicitly indicated that the defined rubber processing technology, including the turbulator, was licensed exclusively[6] to Welding.

---

[3]     Joint Exhibit 31 at p. 4-5.

[4]     This definition was later adopted by the parties in a 2015 agreement. *See* Joint Exhibit 24 at p. 3.

[5]     Trial Transcript for November 20, 2019 ("TT1") 60:21-23.

[6]     Exclusivity was within a defined territory, specifically "all of the world, excluding, however, the continental United States of America, Alaska, Canada, and Mexico." Joint Exhibit 43 at p. 2-3.

On that same date—April 16, 1998—Welding, WEI, and NFM entered into a Cross-License Agreement,[7] in which NFM specifically acknowledged that "[WEI and Welding] have developed or otherwise acquired unique and substantial expertise, know-how, patents and trade secrets relating to equipment designed and manufactured for the purpose of dewatering and finishing of polymers based on single screw slurry feeders, single screw dewaterers, single screw dryers and turbulators[.]"[8]  In exchange for royalties, the Cross-License Agreement conferred a license to NFM to make and sell "any and all inventions, improvements, designs, know-how, patents, processes and equipment discovered, developed or otherwise acquired and maintained by [WEI] or [Welding]" in connection with WEI and Welding's business of single screw extruders and related equipment, including, but not limited to, a specific list of products, which included a turbulator.[9, 10]

Under the Cross-License Agreement, NFM either ordered turbulators directly from Welding and sold them to NFM's customers, or requested technical drawings of the turbulator from Welding (that Welding provided) for NFM to build the turbulator on its own to sell directly to customers.  Over the term of the Cross-License Agreement, NFM requested and received turbulator drawings for NFM to build turbulators for the following customers: Kraton, Dyneon, and Zeon.  Accordingly, NFM paid Welding royalties, pursuant to the Cross-License Agreement, for the turbulators and any spare parts therefor, that NFM made for Kraton, Dyneon, and Zeon.

---

[7]      *See* Joint Exhibit 23.

[8]      Joint Exhibit 23 at p. 1.

[9]      Joint Exhibit 23 at p. 1-2, 15.

[10]      The applicable territory of the NFM's license was limited to the continental United States, Alaska, Canada, and Mexico (geographic areas that Welding's license did not cover).

In 2006, WEI and Welding executed several new agreements.  One such agreement was entitled Assignment of Technology and Termination of License Agreement ("Technology Assignment").[11]  In the Technology Assignment, WEI transferred to Welding "all of [WEI]'s rights, titles and interests in and to" the technology that was the subject of the parties' 1998 license agreement, which included turbulators.[12]  Necessarily, because WEI no longer owned or had any rights to turbulator technology upon the execution of the Technology Assignment, WEI and Welding also executed an agreement entitled Assignment and Assumption of License Agreement ("Cross-License Assignment"),[13] through which Welding assumed all of WEI's rights and obligations under the Cross-License Agreement previously executed among WEI, Welding, and NFM.  After WEI and Welding executed the Technology Assignment and the Cross-License Assignment, NFM paid all royalties it owed under the Cross-License Agreement directly and exclusively to Welding.

In 2014, after NFM had received (over time) the technical drawings from Welding for the Kraton, Dyneon, and Zeon Turbulators, NFM built a turbulator[14] for its customer, Exxon.  NFM

---

[11]     *See* Joint Exhibit 48.

[12]     Joint Exhibit 48 at 1.

[13]     *See* Joint Exhibit 47.

[14]     In its filings, NFM characterizes the device that it built for Exxon as a "cutter" or "pelletizer," rather than a turbulator.  However, this Court previously granted Welding's renewed motion to preclude NFM from arguing and/or introducing evidence at trial that the Exxon device did not satisfy the tangible components of the Turbulator Technology definition (*i.e.*, that it did not have a cylindrical cutter, cylindrical die, pelletizer, and transport system of the comminuted particles either by air or another fluid).  Thus, the Exxon device will be regarded as a turbulator, consistent with the tangible components of the Turbulator Technology definition.

Regardless, the precise characterization of this device is irrelevant—what is relevant is that the device NFM made for Exxon was not based on any specifically-requested technical drawings received from Welding, the point NFM's counsel clarified at trial that it was trying to make.  *See* Trial Transcript for November 21, 2019 ("TT2") 149:10-150:10 (explaining that, regarding the Exxon device, NFM contests the applicability of the proprietary component of the TTA's definition).

did not request a turbulator or any drawings thereof from Welding to build the Exxon Turbulator, nor did Welding ever provide NFM with any technical drawings for an Exxon Turbulator.[15]  NFM subsequently paid Welding royalties for the turbulators it made for Exxon (and any spare parts therefor) and described those payments as being made pursuant to the Cross-License Agreement.

In 2015, Welding and NFM entered into another agreement entitled the Technology Transfer Agreement ("TTA").  The TTA terminated the Cross-License Agreement and established two new licenses between the parties regarding turbulators.  The first license, contained in Section 4.1 of the TTA, allowed NFM to provide spare parts for servicing turbulators belonging to a specific list of NFM's customers (Solvay, Lanxess, Kraton, Dyneon, and Zeon), for a period of five years.  The second license, contained in Section 4.4 of the TTA, allowed NFM to provide spare parts for servicing the Exxon Turbulator and to manufacture new turbulators (and spare parts therefor) for Exxon and its affiliates, in perpetuity.  Both licenses required NFM to pay royalties to Welding for the turbulators and spare parts, as described in Sections 4.1 and 4.4.[16]

The technology that was the basis of the two licenses was defined by the parties in Section 1.1.8 of the TTA as "Turbulator Technology": "a proprietary device invented and developed by [Welding] which integrates a cylindrical cutter and cylindrical die (fixed or variable), a pelletizer and a transport system of the comminuted particles either by air or another fluid."[17]  At trial, NFM conceded through the testimony of its CEO, Philip Roberson ("CEO Roberson") that the Turbulator Technology defined in the TTA was "the same technology that NFM licensed from

---

[15]    Welding did not provide any such drawings under either the Cross-License Agreement *or* the later-executed TTA.

[16]    Joint Exhibit 24 at p. 7-8.

[17]    Joint Exhibit 24 at p. 3.

[Welding] in the [Cross-License Agreement]."[18]   During his testimony, CEO Roberson also concede that the Turbulator Technology licensed in the TTA "is proprietary to [Welding]."[19]

After the parties executed the TTA, NFM paid royalties to Welding on a quarterly basis in accordance with the TTA.  The first royalty payment NFM made under the TTA was made in January 2016 and was accompanied by an itemized list of sales and their corresponding royalty payment; the list included sales of spare parts for Exxon Turbulators.  The second royalty payment NFM made under the TTA was made in April 2016 and accounted for sales of spare parts for the Lanxess Turbulator and the Dyneon Turbulator.  The third royalty payment NFM made under the TTA was in July 2016 and accounted for sales of spare parts for Exxon, Arlanxeo,[20] and Kraton Turbulators.  The fourth royalty payment NFM made under the TTA was in January 2017 and accounted for the sale of spare parts to Arlanxeo.  After Welding filed this lawsuit against NFM on September 7, 2016, NFM began designating its royalty payments as paid under dispute pending the conclusion of this litigation.  Notably, CEO Roberson testified that NFM does not dispute that it has a royalty obligation whenever it creates a device or spare parts using Turbulator Technology, as defined in the TTA.  He also testified that NFM has not designed its own turbulator, nor is NFM licensing turbulator technology from any company other than Welding,[21] and that all of the turbulators that NFM manufactures are made using the Turbulator Technology described and defined in the TTA.[22]

---

[18]   TT2 71: 21-25.

[19]   TT2 76: 2-5.

[20]   Arlanxeo is the company formerly known as Lanxess.

[21]   *See* TT2 82: 6-10.

[22]   *See* TT2 75:1-10

_Count Four: Conclusions of Law with Respect to Royalties for Turbulator Technology_

Sections 4.1 and 4.4 of the TTA clearly identify the items for which NFM owes royalties to Welding; _to wit_: (1) spare parts for servicing turbulators belonging to NFM's customers Solvay, Lanxess, Kraton, Dyneon, and Zeon;[23] (2) spare parts for servicing turbulators belonging to Exxon and its affiliates; and (3) manufactured turbulators for Exxon and its affiliates.  Specifically, section 4.1 requires royalty payments for items for Lanxess, Dyneon, and Solvay whenever they are "design[ed], . . . servic[ed], manufacture[d], market[ed], or s[old]"[24] by using the "Purchased Technology" defined in the TTA, and items for Kraton and Zeon whenever they are provided by using the "Turbulator Technology" defined in the TTA.[25]  Section 4.4 requires royalty payments for items for Exxon and its affiliates whenever the items are "manufacture[d], market[ed,] and s[old]" by using the "Turbulator Technology" defined in the TTA.[26]  Therefore, only spare parts and turbulators sold by NFM that were either designed, serviced, manufactured, or marketed by use of the Purchased Technology or by the Turbulator Technology are subject to royalty payments.  Conversely, if NFM were to sell spare parts or turbulators that were _**not**_ designed, serviced, manufactured, or marketed by use of either the Purchased Technology or the Turbulator Technology, then NFM would not be required to pay royalties for those items to Welding.

The parties do not have a dispute regarding the application of the "Purchased Technology" definition to the royalty payments; rather, they dispute the application of the "Turbulator Technology" definition.  As noted, Section 1.1.8 of the TTA defines Turbulator Technology as "a

---

[23]     For a period of five years from the effective date defined in the TTA.

[24]     Joint Exhibit 24 at § 4.1, 4.2.

[25]     Joint Exhibit 24 at § 4.1, 4.2.

[26]     Joint Exhibit 24 at § 4.4, 4.5.

proprietary device invented and developed by [Welding] which integrates a cylindrical cutter and cylindrical die (fixed or variable), a pelletizer and a transport system of the comminuted particles either by air or another fluid."[27]   In a prior Order, this Court held that, for each device to which the parties dispute the application of the Turbulator Technology definition (the "Disputed Devices"), Welding has the burden to prove that the device was designed, serviced, manufactured, or marketed by using the Turbulator Technology.[28]   Welding must, therefore, show that all portions of the Turbulator Technology definition apply to the technology underlying the design, service, manufacture, or marketing of the Disputed Devices.   The Disputed Devices include the existing Exxon, Solvay, Arlanxeo, Dyneon, Kraton, and Zeon Turbulators, for which NFM previously paid royalties to Welding.   At trial, NFM attempted to show that the Disputed Devices do not fall within the definition of Turbulator Technology because: (1) Welding did not invent or develop the underlying technology; (2) the underlying technology is not proprietary to Welding; and (3) the Exxon devices, specifically, were not based on the underlying technology.   This Court finds that the evidence of record does not support NFM's arguments.

As to the invention and development requirement, NFM contends "[i]t is undisputed that [Welding] did not invent Turbulator Technology" (using that capitalized term to refer not to the comprehensive TTA definition, but to the underlying technology itself).[29]   Specifically, NFM argues that Welding's former parent company, WEI, was the entity that literally invented the turbulator and, therefore, Welding did not invent the underlying technology, thus, rendering all of

---

[27]     Joint Exhibit 24 at p. 3.

[28]     *See* ECF 129 at 2.

[29]     NFM's Proposed Findings of Fact and Conclusions of Law, ECF 149, at ¶ 162.

the technology that has changed hands between NFM and Welding outside of the scope of the TTA's definition of Turbulator Technology.

Under the layman's definition of the word "invent," NFM would be correct that Welding did not invent the turbulator. However, NFM's reliance on such a definition is misplaced. In the context of an intellectual property contract, the term "invent" implicates the legal rights associated with inventorship and the possession of those rights, thus rendering "invent" more of a term of art. The act of inventing something bestows various proprietary rights upon that literal inventor. *See* Michael A. Epstein, Epstein on Intellectual Property 14-3, 5th ed. 2019 ("As a general rule, an inventor owns the rights in his or her inventions"). NFM argues that "inventorship" cannot be assigned from one party to another, but does not cite to a statute, case, or other source that establishes such a rule of law. Contrarily, it is common for inventorship (and the rights associated therewith) to be assigned from one party to another, often from an individual employee to the business entity that employs said individual. *See generally* Epstein on Intellectual Property 14-3-14-23 ("[Although the general rule is that an inventor owns the rights to his or her inventions,] there are several means by which an employer may obtain ownership of, or the right to use, an employee's invention.") (also describing the various circumstances where inventors assign their inventions, and rights thereto, to other parties).

While "'ownership' and 'inventorship' are not identical for *patent law* purposes," *Univ. Patents, Inc. v. Albert M. Kligman*, 762 F. Supp. 1212, 1218 (E.D. Pa. 1991) (emphasis added, as this matter is not a patent law case), as "the inventor and the owner of a [certain technology] may not be the same person[,]" *Sim Kar Lighting Fixture Co. v. Genlyte, Inc*., 906 F. Supp. 967, 972 (D.N.J. 1995), and while any assignment of rights regarding certain technology does not *factually* change the identity of the individual who literally invented the technology, neither of those facts

necessitate the conclusion that the rights associated with inventorship cannot be assigned from one party to another.[30, 31]   In fact, such assignments frequently occur and did occur in this case, as evidenced by the following established facts:  WEI invented the turbulator and, since its invention, shared the turbulator technology with Welding.  In 2006, WEI and Welding entered into the Technology Assignment in which WEI gave all of its rights, titles, and interests to the turbulator to Welding.  The Technology Assignment specifically indicated that the technology WEI was assigning to Welding included, "*inventions*, improvements, designs, know-how, [and] patents" relating to the turbulator (emphasis added).[32]  The Technology Assignment further indicated that "WEI desire[d] to transfer to [Welding] *all of [WEI]'s rights to the Technology*[.]" (emphasis added).[33]  WEI did not assign *some* of its rights and interests in the turbulator, it assigned and transferred *all* of its rights and interests therein, which comprised any and all proprietary rights, including those associated with inventorship and ownership.  Further, under the Technology Assignment, WEI did not retain, exclude, or reserve any rights regarding the turbulator.

---

[30]     Even the cases NFM cites to support its contention that inventorship cannot be assigned *actually* involve disputes over inventors assigning (or refusing to assign) their inventions (and all rights to their inventions) to other entities.  Those disputes are not as to whether assignment of inventorship is permitted, but, rather, are disputes regarding collateral issues associated with assignment.  *See Univ. Patents, Inc.*, 762 F. Supp.; *Sim Kar Lighting Fixture Co.*, 906 F. Supp.

[31]     "Generally, all rights are assignable unless forbidden by statute, the contract creating the right, or by the policy of the common law."  *Richardson v. Kolsun*, 2014 Phila. Ct. Com. Pl. LEXIS 264, at *6-7 (Phila. Ct. Com. Pl. 2014), *aff'd*, 120 A.3d 373 (Pa. Super. 2015) (internal quotations omitted) (quoting *Glenside Home Protective Ass'n v. Cheltenham & Abington Sewerage Co.*, 81 Pa. D. & C. 349, 352 (Pa. Ct. Com. Pl. 1949) (citing Restatement (First) of Contracts § 151)); *see Daino v. Atlantic Refining Co.*, 399 Pa. 606, 606 (Pa. 1960) (adopting Restatement (First) of Contracts § 151); *see also* Restatement (Second) of Contracts § 317(2) ("A contractual right can be assigned unless . . . [it] is forbidden by statute or is otherwise inoperative on grounds of public policy, or . . . [is] precluded by contract.").

[32]     Joint Exhibit 43 at p. 2 (defining the "Rubber Processing Technology," which the Technology Assignment incorporates and relabels as the "Technology" that is being assigned to Welding (Joint Exhibit 48 at p. 1)) (emphasis added).

[33]     Joint Exhibit 48 at p. 1.

It is well-settled that "where an assignment is effective, the assignee stands in the shoes of the assignor and assumes all of [its] rights[.]"  *Sync Labs LLC v. Fusion Mfg.*, 2016 U.S. Dist. LEXIS 158811, at *25 (D.N.J. Nov. 16, 2016) (citing Restatement (Second) of Contracts § 317 (1981)); *see also Montalbano v. Calvary Portfolio Servs.*, 2013 U.S. Dist. LEXIS 20636, *9-14 (W.D. Pa. Feb. 15, 2013) (explaining that, through assignment, parties "may confer their proprietary interests in whole or in part to others, assignees who then 'stand in the shoes' of the assignors" and noting that, under Pennsylvania law, "an assignee's rights . . . are not inferior to those of the assignor.") (citing *Crawford Cent. Sch. Dist. v. Commonwealth of Pa.*, 585 Pa. 131, 135-36 (Pa. 2005)).  Thus, this Court finds that after the Technology Assignment was executed (which predated the TTA by several years), Welding became the sole, rightful possessor and owner of all rights associated with the turbulator—rights that are not inferior to the rights WEI possessed before they were assigned.  Welding is—for all legal purposes—considered the inventor of the turbulator, possessing all rights that stem from inventorship thereof.  Therefore, NFM's argument that Welding did not "invent" any of the technology that has changed hands between the parties is without merit.[34]

---

[34]     In addition, it is worth noting that if NFM's contention regarding inventorship was accurate, then none of the technology that has changed hands between the parties would constitute Turbulator Technology under the TTA since all portions of the Turbulator Technology definition must apply, including the inventorship portion.  Further, if this were the case, the portions of the TTA regarding royalties would be superfluous, because NFM would essentially have no royalty obligations (since none of the technology that has changed hands constitutes Turbulator Technology, and royalties are due on Turbulator Technology).  Such an interpretation violates the canon of contract construction that "courts should an not interpret contracts in a way that renders at least one clause superfluous or meaningless."  *Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 181 (3d Cir. 2011) (internal citations and quotations omitted).  *See, also, Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987) ("A third principle of construction instructs that a contract should be read so as to give meaning to all of its terms when read as an entirety.  Accordingly, a construction which neutralizes any provision of a contract should never be adopted if the contract can be so construed as to give effect to all the provisions.  The meaning of a particular phrase is not properly determined by considering the phrase in isolation but by reading it in harmony with the rest of the contract." (internal citations and quotations omitted)).

At trial, NFM also argued that the turbulator technology is not proprietary to Welding. While NFM's attorneys maintained this argument during and after trial, the parties ultimately agreed during the trial that the turbulator technology was proprietary to Welding.[35]  Thus, this Court finds that there is no disputed issue of fact regarding the proprietary requirement, nor is there any evidence contrary to the parties' consensus that the turbulator technology was proprietary to Welding.[36, 37]

---

Thus, interpreting the inventorship component of the Turbulator Technology definition as requiring the literal inventor to have been an employee of Welding at some point in time after Welding took the form of its current corporate structure would render the TTA's royalty provisions meaningless and superfluous, requiring no payment from NFM.  Such an interpretation would also render the licensing provisions meaningless because, if Turbulator Technology does not include any technology that Welding obtained through the Technology Assignment from WEI in 2006, then Turbulator Technology would not include any technology at all, since Welding obtained turbulator technology through its collaboration and contracts with WEI.  If there is no technology that meets the definition of Turbulator Technology, then NFM did not obtain a license to any technology through the TTA, rendering the license provisions also meaningless. Rather, as explained *supra*, the Court must read the inventorship component of the definition in a manner that "give[s] meaning to all of [the TTA's] terms when read [in its] an entirety[, and] . . . consider[] the phrase . . . by reading it in harmony with the rest of the contract."  *Contrans, Inc.*, 836 F.2d at 169.

[35]     As previously noted, NFM's CEO Roberson testified that the Turbulator Technology licensed in the TTA is proprietary to Welding.  TT2 76: 2-5.

[36]     NFM's counsel argued that because all of the patents underlying turbulator technology are expired (and were expired at the time the parties executed the TTA), the technology cannot be considered proprietary.  This argument is unpersuasive.  When the parties executed the TTA, all of the patents related to the turbulator and modifications thereto had long since expired.  Thus, the non-existence of patent ownership did not deter the parties from agreeing that the underlying technology could be described as proprietary, which is consistent with the well-settled legal principle that trade secrets are distinct from patents and can be licensed on their own, independent of patent status. *See, e.g., NOVA Chems., Inc. v. Sekisui Plastics Co.*, 579 F.3d 319 (3d Cir. 2009); *see also Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979).

[37]     In addition, as with NFM's arguments regarding inventorship, *see supra* pp. 12-13, NFM's contention that none of the technology exchanged between the parties is proprietary to Welding would render the royalty provisions meaningless for the same reasons.  Again, such an interpretation would violate several canons of construction.

*Application of Definition to the Disputed Devices, Generally* [38]

This Court previously held that, for Count 4 of the counterclaim, Welding had the burden of proving at trial that it invented and developed technology that satisfied every component of the TTA's definition of Turbulator Technology for each of the Disputed Devices. *See* [ECF 129 at 2]. The parties do not appear to dispute that each of the Disputed Devices, except the Exxon Turbulator, satisfy the tangible components[39] of the Turbulator Technology definition. Thus, what remains for analysis is whether each of the Disputed Devices satisfies the ownership component of the Turbulator Technology definition. The ownership component requires that the device is "a proprietary device invented and developed by [Welding.]"[40] This phrase essentially differentiates between (A) technology that fits the tangible definition and is *owned by Welding* and (B) technology that fits the tangible definition and is *owned by a third party*, so that NFM would only owe royalties whenever NFM utilized Welding's technology and would not owe royalties if it used similar technology, composed of the same tangible parts as the turbulator but received from any other entity. This is evidenced by NFM's concession at trial, through CEO Roberson's testimony, that the technology that is defined in and governed by the TTA is "the same technology that NFM licensed from [Welding] in the [Cross-License Agreement]."[41]

---

[38]    The forthcoming analysis applies to all of the Disputed Devices, including the Exxon Turbulator. However, NFM makes an additional argument regarding the ownership component of the definition as applied to the Exxon Turbulator, which this Court will address separately, *infra*.

[39]    The tangible components are that the device "integrates a cylindrical cutter and cylindrical die (fixed or variable), a pelletizer and a transport system of the comminuted particles either by air or another fluid." Joint Exhibit 24 at p. 3.

[40]    The ownership component is that the device is "a proprietary device invented and developed by [Welding.]" Joint Exhibit 24 at p. 3.

[41]    TT2 71: 21-25.

As noted, this Court has found that the turbulator technology is proprietary to Welding. Indeed, for all Disputed Devices except the Exxon Turbulator, NFM requested and received from Welding either the device itself, or the technical drawings and specifications explaining how to build the various devices.   Further, CEO Roberson testified that NFM did not receive such information from any other source.[42]

Regarding the "invented" and "developed" portions of the ownership component, when this Court held that Welding had the burden to prove that it invented and developed the technology underlying the Disputed Devices, Welding, thus, needed to prove that it possesses the rights and interests associated with inventorship and development, not that an employee of Welding (as it currently stands as a corporate entity) was the actual, literal inventor of the turbulator technology. Welding has presented credible evidence to establish that it is the sole, lawful possessor and/or owner of all proprietary rights associated with the turbulator, by way of the Technology Assignment.   NFM's arguments to the contrary, though creative, are rejected.   As such, this Court concludes that the credible evidence of record has established that the Solvay, Arlanxeo, Dyneon, Kraton, and Zeon Turbulators comport with every component of the TTA's definition of Turbulator Technology.   Therefore, Welding met its burden of proof with respect to those devices.

*Application of Definition to the Exxon Turbulator*

The aforementioned analysis regarding the Disputed Devices *generally* also applies to the specific disputed device of the Exxon Turbulator.   At trial, NFM offered an additional argument regarding the ownership component of the TTA's definition as applied to the Exxon Turbulator. Specifically, NFM points to the facts that when it built the Exxon Turbulator, it did not request said turbulator from Welding, nor did it request any technical drawings from Welding from which

---

[42]     *See* TT2 82: 6-10.

to build the Exxon Turbulator.  Welding does not dispute these facts.  Based on those facts, NFM asks this Court to find that the Exxon Turbulator was not created using Welding's proprietary technology and, therefore, does not comport with the TTA's definition of Turbulator Technology, which would render the Exxon Turbulator not subject to royalties.  This Court disagrees and finds this argument legally unpersuasive.  While Welding never provided NFM a turbulator or with technical drawings for the specific purpose of building a turbulator for Exxon, as Welding had done with the other Disputed Devices, those facts do not necessitate the conclusion that the Exxon Turbulator was not built using Welding's proprietary technology.  Welding contends, to the contrary, that the only reasonable conclusion based on the available evidence before this Court is that NFM built the Exxon Turbulator using Welding's proprietary technology that Welding had previously provided to NFM.  This Court agrees.

In reaching this conclusion, this Court relied on the following facts:  NFM built and sold the Exxon Turbulator in 2014.  Prior to that time, NFM had received numerous technical drawings from Welding containing proprietary information regarding how to build turbulators for NFM's customers Dyneon, Kraton, and Zeon.  Thus, NFM possessed technical, proprietary information on how to make several models of turbulators at the time that it built and sold the Exxon Turbulator.  This evidence strongly supports an inference that the technical drawings Welding previously provided to NFM had served as the basis for the Exxon Turbulator.  While said evidence and inference might not be sufficient to sustain Welding's burden of proof, it is the complementary concession from NFM's CEO at trial that necessitates the conclusion that NFM did, indeed, use proprietary information that it received from Welding to build and sell the Exxon Turbulator.  Specifically, CEO Roberson testified that: (1) NFM has not designed its own turbulator;[43] (2) NFM

---

[43]     *See* TT2 82: 6-10.

was not licensing turbulator technology from any company other than Welding at the time NFM built the Exxon Turbulator;[44] and (3) all of the turbulators that NFM manufactures are made using the Turbulator Technology described and defined in the TTA.[45]  This Court has also considered that turbulators are unique equipment.  Logic dictates that the technical information used to build the Exxon Turbulator came from somewhere.  Since NFM's CEO testified that the technical information it used did not come from another company (other than Welding), nor did NFM develop the technology on its own, this Court concludes that NFM then must have used the drawings Welding provided for several other turbulators, which were in NFM's possession at the time.  Further, NFM's CEO admitted that NFM did not manufacture any turbulators other than those based on the Turbulator Technology described and defined in the TTA—that which is proprietary to Welding.  Based on the preponderance of the evidence, this Court to conclude that NFM built the Exxon Turbulator using at least some, if not all, of Welding's proprietary information regarding Turbulator Technology, specifically in the form of Welding's technical drawings.  As such, the evidence of record supports this Court's finding that the Exxon Turbulator also comports with the TTA's definition of Turbulator Technology.

In conclusion, this Court finds that all of the Disputed Devices comport with the TTA's definition of Turbulator Technology.  Therefore, NFM must pay royalties to Welding for the sale of all Disputed Devices and spare parts therefor, in the amounts defined in Sections 4.1 and 4.4 of the TTA.  However, should NFM ever sell spare parts or turbulators that do not use Turbulator

---

[44]     *Id.*

[45]     *See* TT2 75:1-10

17

Technology, then NFM will not be required to pay royalties for those items to Welding.[46, 47, 48]

## COUNT SIX- HIP BARREL MANUFACTURING

### *Introduction*

At Count Six of NFM's Counterclaims, NFM seeks a declaratory judgment (1) that

Welding is not permitted to offer barrels manufactured with hot isostatic pressing technology

---

[46]    For example, as Welding explained, there are several different types of cutters/cutting devices in the market that do not integrate a cylindrical cutter, a cylindrical die, a pelletizer, and a transport system of the comminuted particles either by air or another fluid.  If NFM developed or built such a cutter, it would not be based on the Turbulator Technology (specifically, it would not satisfy every tangible component of Turbulator Technology) and, thus, NFM would not owe Welding any royalties on such a device.

[47]    Welding's contention that "NFM is required "to pay [Welding] a royalty on *any* turbulator it sells, *regardless of whether the machine is based on [Welding's] proprietary Turbulator Technology* . . . .," is incorrect.  Plf. Reply re MSJ, ECF 69, at p. 18 (emphasis added).  Similarly, Welding's contention that "NFM is obligated to pay a royalty on *any* turbulator it sells, *regardless of whether the turbulator is based on [Welding]'s Turbulator Technology*[,]" is also incorrect.  Plf. Pretrial Memo, ECF 89, at p. 5 n.12 (emphasis added).  To the contrary, the ownership component of the Turbulator Technology definition is as important as the tangible component.

[48]    The parties also present a dispute regarding a hypothetical concern of NFM "reverse-engineering" its own turbulator from the Turbulator Technology in the future.  To the extent that NFM contends that it should be permitted to "reverse-engineer" its own turbulator from the expired patents and/or information it has received from Welding in the past and, thus, not be required to pay royalty payments, NFM is mistaken.  Obligations under a contract for royalties are separate and apart from obligations relating to patented technology, even when the royalties are for said patented technology.  The Court of Appeals for the Third Circuit's decision in *NOVA Chems., Inc. v. Sekisui Plastics Co.*, 579 F.3d 319 (3d Cir. 2009) and its explanations of *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655 (S.D.N.Y. 1959) are instructive here.  The court in *Warner-Lambert* held that "parties are free to contract with respect to a . . . trade secret in any manner which they determine for their own best interests. . . . [An entity that] discovers [the trade secret] for himself by legitimate means is entitled to its use.  But that does not mean that one who acquires a . . . trade secret through a valid and binding contract is then enabled to escape from [a royalty] obligation to which he bound himself[.]"  178 F. Supp. at 665.  The court in *NOVA Chems., Inc.* summarized this *Warner-Lambert* holding as finding "that Warner-Lambert was obligated to continue making the [royalty] payments as long as it made a product based on the original formula [that it received pursuant to the license agreement]."  579 F.3d at 328-29.  Thus, if NFM developed its own turbulator based on any information it received from Welding regarding Turbulator Technology, although Welding would not be able to stop NFM from developing and selling said turbulator, Welding would remain entitled to royalties from the sale thereof, because NFM would have created the device using the original proprietary information it received from Welding under the TTA's licenses.  In other words, nothing in the TTA prevents NFM from attempting to develop its own turbulator, but if NFM does so by using any Turbulator Technology received from Welding, it must still pay royalties on that newly-designed turbulator to Welding (for the term agreed to in the TTA).

("HIP Barrels") to Welding's customers and (2) that NFM is entitled to sell HIP Barrels to any customer in any field of use.  [ECF 17].  In support of these requested declarations, NFM primarily presented argument that HIP Barrels were expressly excluded from the TTA's definition of Purchased Technology and, thus, (a) "there was no intention to assign any rights to [Welding] that would permit [Welding] to use HIP barrel technology or to sell HIP barrels with the 'Purchased Technology[,]'" and (b) no restrictions in the TTA apply to NFM's use and sale of HIP Barrels.  [ECF 107].  Welding disagreed and presented argument that (1) the TTA does not impose any restriction on Welding regarding its sale or use of HIP Barrels and (2) an exclusivity provision in the TTA prohibits NFM from selling HIP Barrels within a particular field of use (drying and removal of water from Butyl, Halobutyl and fluorinated rubber).  Based upon the preponderance of evidence, and for the reasons set forth below, this Court finds that (1) Welding is not restricted from developing or selling HIP Barrels to its customers and (2) NFM is not restricted from developing or selling HIP Barrels in any field of use.

<u>Count Six: Findings of Fact with Respect to HIP Barrel Manufacturing</u>[49]

In addition to the licensing provisions discussed *supra*, the TTA contained an agreement between the parties in which Welding purchased certain technology from NFM.  This technology was identified as "Purchased Technology" and defined by the parties in Section 1.1.7 of the TTA as:

> the entire right, title and interest of [NFM] in the Intellectual Property, including all Know-how, except for the rights retained by [NFM] in Section 2.2, whether possessed or created by [either party], used in or associated with non-intermeshing, counter-rotating twin screw extruders used for the drying and removal of water from Butyl, Halobutyl and fluorinated rubber . . . , and any spare parts thereto, and further including any and all improvements thereto ("Field of Use") developed prior to the date of this Agreement. Intellectual Property not already in the possession of [Welding] shall be excluded from the scope of "Purchased Technology" with the following exception: Intellectual Property not in the possession of [Welding] that

---

[49]     *See supra* n.2.

relates to equipment in the Field of Use sold to existing customers of [NFM], except for Exxon or Exxon Affiliates, shall be part of the Purchased Technology. . . . Further, barrels manufactured with hot isostatic pressing (HIP) technology shall be excluded from the scope of "Purchased Technology."[50]

The barrels manufactured with hot isostatic pressing technology ("HIP Barrels") referred to in the Purchased Technology definition are a type of barrel that can be used as a component of a device called a counter-rotating, non-intermeshing twin screw extruder ("CRNI"). HIP Barrels are just one type of barrel that can be used for this purpose; other types of barrels include liner barrels, monoblock barrels, and spin-casting barrels (together, "Traditional Barrels"). Traditional Barrels and HIP Barrels can be used interchangeably in CRNIs.[51]

The TTA's definition of Purchased Technology contains three main parts: (1) a description of the intellectual property being sold, (2) the scope or extent of that intellectual property, and (3) specific exclusions from the definition. The intellectual property being sold was defined as "the Intellectual Property, including all Know-how . . . used in or associated with [CRNIs] . . . and any spare parts thereto[.]"[52] The scope thereof is such intellectual property to the extent that it is used for the drying and removal of water from Butyl, Halobutyl and fluorinated rubber (the "Field of Use"). Specifically excluded from that intellectual property is (1) anything not already in

---

[50]     Joint Exhibit 24 at p. 2-3.

[51]     In or around 1999-2000, NFM began efforts to develop a HIP Barrel. Over time, NFM developed its HIP Barrel for application to CRNIs for devolatilization, and eventually developed a HIP Barrel for application to CRNIs for drying and dewatering of butyl, halobutyl, and fluorinated rubber.

[52]     Joint Exhibit 24 at p. 2-3.

Welding's possession at the time the TTA was executed[53] and (2) "barrels manufactured with hot isostatic pressing (HIP) technology[.]"[54]

The TTA also contains an exclusivity agreement between the parties in Section 5.1, which provides, in part: "neither [NFM] or any of its Affiliates . . . will directly or indirectly engage in the business of designing, manufacturing, marketing and/or selling equipment or services based on the Purchased Technology in the Field of Use, anywhere in the world[.]"[55, 56]

*Count 6: Conclusions of Law with Respect to HIP Barrel Manufacturing,*
*Part A: NFM's Rights*

The parties clearly defined several operative terms in the TTA and agreed that the listed terms "shall have the meanings given to them in this [Definitions Section], unless specifically otherwise stated."[57]  As such, this Court is bound by the definitions agreed to in the contract and cannot interpret the TTA in any fashion that "changes the meaning of a clearly defined term[.]" *Krizovensky v. Krizovensky*, 425 Pa. Super. 204, 213 (1993).  As such, this Court finds that a fair reading of the TTA clearly indicates that the term "Purchased Technology" does not, under any circumstances, include HIP Barrel technology.  The parties could not have been more precise when they agreed that: "Further, barrels manufactured with hot isostatic pressing (HIP) technology *shall*

---

[53]    Within this exception is an exception, rendering the following intellectual property *included* in the definition of Purchased Technology: intellectual property related to equipment sold to NFM's existing customers (except for Exxon and its affiliates).

[54]    Joint Exhibit 24 at p. 3.

[55]    Joint Exhibit 24 at p. 3.

[56]    The Exclusivity Provision included an exception allowing NFM to use its Retained Rights under Section 2.2(a) of the TTA either (1) outside the Field of Use, (2) solely for Exxon or Exxon Affiliates, or (3) for Welding in accordance with Section 2.2 of the TTA.  These exceptions are not relevant to the issues being discussed here.

[57]    Joint Exhibit 24 at p. 2.

*be excluded* from the scope of 'Purchased Technology.'" (emphasis added).[58]   Therefore, whenever the term "Purchased Technology" is used in the TTA, it is as if the included technology is relisted and the HIP Barrels exclusion from the included technology is reiterated.  To hold otherwise would be to render the defined terms meaningless.  *See Sloan & Co.*, 653 F.3d at 181 ("courts should not interpret contracts in a way that renders at least one clause superfluous or meaningless.") (internal citations and quotations omitted).  Despite Welding's request, this Court cannot "distort the meaning of the language [in the agreement] or resort to a strained contrivance in order to find an ambiguity."  *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606 (1999).

Consequently, Welding's argument regarding the TTA's Exclusivity Provision is also without merit.  Welding presented evidence and argument that the Exclusivity Provision in Section 5.1 prohibits NFM from selling HIP Barrels in the Field of Use.  The evidence, however, does not support this interpretation.  Section 5.1[59] establishes a promise from NFM that it will not "directly or indirectly engage in the business of designed, manufacturing, marketing and/or selling

---

[58]     Joint Exhibit 24 at p. 2-3.

[59]     "Under the parol evidence rule, where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, *but the only, evidence* of their agreement . . . and its terms and agreements cannot be added to nor subtracted from by parol evidence."  *Meyer-Chatfield v. Century Bus. Servicing, Inc.*, 732 F. Supp. 2d 514, 519 (E.D. Pa. 2010) (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 (Pa. 2004)) (internal quotations and alterations omitted) (emphasis added).  "Parol evidence is any oral testimony, written agreements, or other writings created prior to the contract that would serve to explain or vary the terms of a contract."  *Id.* (citations omitted).  As an exception, the parol evidence rule "does allow the admission of evidence to explain an ambiguity in a contract[.]"  *Id.*

Here, both parties utilize extrinsic parol evidence in their various arguments regarding the meaning of provisions in the TTA.  As previously noted, the definition of Purchased Technology is unambiguous, as is the Exclusivity Provision.  Accordingly, this Court gives no weight to any such evidence offered by either party and has considered only the written agreement itself.

equipment or services based on the Purchased Technology in the Field of Use[.]"[60]  Consistent with this provision, NFM cannot design, make, market, or sell, in the Field of Use, any items included in the definition of Purchased Technology, or based thereon.  Because HIP Barrels are explicitly, unambiguously excluded from the definition of Purchased Technology, Section 5.1 does not restrict NFM from designing, making, marketing, or selling HIP Barrels in any way.  The use/inclusion of the term Purchased Technology in the exclusivity provision limits the scope and applicability of the exclusivity provision itself.  The parties could have listed or defined any variation of items or technology to be subject to exclusivity,[61] but instead chose to use the defined term of Purchased Technology.  In doing so, the parties indisputably ascribe all components of that definition to the scope and applicability of the exclusivity provision.  Welding would have this Court ignore the existence of the phrase "Purchased Technology" in Section 5.1, something this Court cannot do.  The plain language of Section 5.1 indicates that NFM is prohibited from designing, making, marketing, or selling equipment or services based on the technology Welding purchased regarding CRNIs, *except for HIP Barrels*, within the Field of Use.  Thus, HIP Barrels are the *only* type of equipment that NFM is permitted to design, make, market, or sell for CRNIs within the Field of Use.

Welding further contends that the sentence excluding HIP Barrel technology from the definition of Purchased Technology was only included for the purpose of making it clear that NFM did not need to give Welding any drawings related to HIP Barrels.  Whether that was, in fact, the motivation is irrelevant.  The effect of the exclusion is unambiguous—the exclusion is

---

[60]     Joint Exhibit 24 at p. 8.

[61]     As NFM pointed out, the parties could have also refrained from listing or defining items to fall within the scope of the exclusivity clause all together and, instead, simply written that NFM cannot design, manufacture, market, or sell equipment or services *in the Field of Use generally*.

permanently part of the definition of Purchased Technology, integrated every time the term is used throughout the contract. Contrary to Welding's assertions, there is no indication in the definition of Purchased Technology that said definition "is records related" or is a "carve-out from the 'equipment drawings and specifications' that NFM was required to transfer to Welding[.]"[62] The definition appears under the heading "DEFINITIONS" and does not include any limitation of the HIP Barrel exclusion, let alone a limitation regarding the exchange of drawings. If Welding had desired the exclusion to apply only to the exchange of drawings, then the parties should not have included the exclusion in the definition of Purchased Technology and, rather, simply included a provision to that effect.

In a final attempt to support its contention that NFM cannot sell HIP Barrels in the Field of Use, Welding argues that interpreting the Exclusivity Provision as excluding HIP Barrel technology would create an impermissible conflict with Section 4.3.[63] This argument is misguided. Section 4.3 dictates the notice NFM must give to its customers regarding spare parts for the technology that Welding purchased and/or licensed from NFM. In relevant part, Section 4.3 provides: "Upon being asked for quotes for any twin screw extruders or spare parts related to Purchased Technology . . . [NFM] shall advise such customers that it is exiting the business relating to the Purchased Technology and in particular the business of selling spare parts used in equipment

---

[62]     Welding's Proposed Findings of Fact and Conclusions of Law, ECF 150, at ¶ 94.

[63]     *See Whitsitt v. Comcast-Spectacor, L.P.*, 2014 U.S. Dist. LEXIS 102960, at *47 (E.D. Pa. July 28, 2014) (quoting *Keystone Fabric Laminates, Inc. v. Fed. Ins. Co.*, 407 F.2d 1353, 1356 (3d Cir. 1969) (applying Pennsylvania law)) (stating the rule of contract construction that "it is axiomatic in contract law that two provisions of a contract should be read so as not to be in conflict with each other if it is reasonably possible." (internal alternations omitted)).

based on [CRNIs] used for the drying and removal of water from Butyl, Halobutyl and fluorinated rubber[.]"[64]

This Court finds no conflict exists between Section 4.3 and the clear interpretation of the Exclusivity Provision as fully integrating the definition of Purchased Technology.  Both Section 4.3 and the Exclusivity Provision use and, thus, fully integrate the defined term "Purchased Technology," which excludes HIP Barrel technology.  Just as the Exclusivity Provision does not prohibit NFM from selling HIP Barrels, Section 4.3 does not require NFM to inform customers that it can no longer provide them with HIP Barrels.  Section 4.3 simply requires NFM to inform customers that "it is exiting the business *relating to the Purchased Technology*" (emphasis added).  Thus, NFM is required to inform its customers that it was exiting the business relating to CRNIs, *except for HIP Barrels*, within the Field of Use, and that HIP Barrels are the *only* type of equipment that NFM is permitted to design, make, market, or sell for CRNIs within the Field of Use; it cannot provide any other equipment for CRNIs within the Field of Use.[65]  This Court further finds that there is no conflict between NFM's obligations under the exclusivity provision and Section 4.3.

Further, this Court agrees with NFM that there is no provision in the TTA that restricts NFM's rights regarding HIP Barrels.  Under the TTA, Welding did not acquire any rights to NFM's HIP Barrel technology, nor did Welding acquire any right to restrict NFM's use of HIP Barrels.  Consequently, NFM did not lose any right, title, or interest regarding its HIP Barrel business, and the TTA does not limit NFM's right to design, manufacture, market, or sell HIP Barrels in any

---

[64]     Joint Exhibit 24 at p. 7.

[65]     NFM's co-founder Paul Roberson testified that he informed NFM's customers of just that.  *See* TT2 at 120:12-121:11.

way.  Thus, NFM may sell its HIP Barrels both inside and outside of the Field of Use.[66]  However, in accordance with the TTA, HIP Barrels are the only type of spare part that NFM is permitted to sell for CRNIs within the Field of Use.

### Count 6: Conclusions of Law with Respect to HIP Barrel Manufacturing, Part B: Welding's Rights

NFM's also seeks a declaratory judgment regarding HIP Barrels in which it asks this Court to determine whether Welding is permitted to offer HIP Barrels to Welding's customers.  Notably, NFM's evidence and submissions barely address this request.  In its trial brief, NFM argues that, in crafting the TTA, it had "no intention to assign any rights to [Welding] that would permit it to use HIP barrel technology or to sell HIP barrels with the 'Purchased Technology.'"[67]  NFM contends that *because of* that lack of intention, and because it did not want to restrict its own ability to sell HIP Barrels, the Purchased Technology definition specifically excluded HIP Barrels.[68]  As with Welding's alleged intention for including the HIP Barrel exclusion in the definition of Purchased Technology, NFM's intention is also irrelevant because the effect of the exclusion in the definition is unambiguous.  As noted, the exclusion provision excluded HIP Barrels from the scope of Purchased Technology; thus, NFM's HIP Barrel technology was not being sold to Welding—that is *all* that the exclusion means.  A careful reading of the TTA reveals no language in the definition of Purchased Technology, in the specific exclusionary sentence, or elsewhere in the contract, that would indicate any agreement regarding Welding's rights or abilities to develop or sell HIP Barrels.  There is simply no language to support NFM's claim that the exclusion of

---

[66]     Other fields of use include, but are not limited to, compounding, devolatilization, latex coagulation, reactive extrusion, or depolymerization.

[67]     ECF 107 at p. 5.

[68]     *Id*.

HIP Barrels from the definition of Purchased Technology also imposed a restriction on Welding that prohibited Welding from engaging in HIP Barrel business and restricted its sales to Traditional Barrels.

Further, at trial, the evidence presented established that NFM does not have any exclusive rights to HIP Barrel technology.  NFM admitted that it does not own a patent for HIP Barrel technology, and that several other companies produce HIP Barrels.  While NFM may have its own proprietary method for making HIP Barrels, that fact does not affect Welding's (or any other company's) ability to develop its own HIP Barrel technology.  Additionally, NFM conceded at trial that Welding is free to make HIP Barrels, as long as Welding did not use any of NFM's allegedly proprietary technology.[69]  Because NFM has not provided Welding with any materials—technical drawings or otherwise—regarding its allegedly proprietary HIP Barrel technology—there is no reason to think that Welding will, or even could, make use of said technology if, in the future, Welding develops or sells HIP Barrels.

Therefore, based on the preponderance of evidence of record, this Court finds that the neither the TTA, nor any law governing proprietary interests, impose any restrictions on Welding regarding its ability to develop, manufacture, source, or sell HIP Barrels to its customers.

**CONCLUSION**

For the reasons provided, judgment on Count Four of NFM's counterclaim is entered in favor of Welding, and judgment on Count Six of NFM's counterclaim is entered, *in part*, in favor of NFM and, *in part*, in favor of Welding.  The corresponding declaratory judgments are set forth in the Order consistent with this Memorandum Opinion.

*NITZA I. QUIÑONES ALEJANDRO*, U.S.D.C. J.

---

[69]     *See* TT2 199:24-200:2.